**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | Criminal Action No. 12-298 (ES) |
| v. | : | |
| | : | **Amended Opinion** |
| FARAD ROLAND, | : | |
| | : | |
| Defendant. | : | |

SALAS, DISTRICT JUDGE

## I. Introduction

This is a death penalty case.  Pending before the Court is a Motion by the United States of America (the "Government") to disqualify Defendant Farad Roland's ("Defendant" or "Roland") counsel, Thomas Ambrosio, Esq.  (D.E. No. 133).  Roland opposes this motion. Briefly, the Government's Motion is premised on the following circumstances.

In early 2014, the District of New Jersey appointed Mr. Ambrosio to represent a confidential witness ("CW").[1]  This representation concerned a cooperation agreement that CW was entering into with the U.S. Attorney's Office.  Separately, in September 2015, Mr. Ambrosio was appointed to represent Roland.  In December 2015, the Government discovered that Mr. Ambrosio was CW's attorney for the cooperation agreement.  Importantly, the Government intends on calling CW to testify against Roland pursuant to CW's cooperation agreement.  So the Government contends that this is an actual and potential conflict of interest because CW is a current—or, at the very least, a former—client of Mr. Ambrosio.

---

[1] As the parties did in arguing the Government's motion, the Court uses the initials "CW" to refer to this confidential witness.

On January 14, 2016, the Court held a hearing on this matter.  Further, after appointing independent conflict counsel to Roland and CW, the Court conducted conflict-of-interest hearings with each individual.  For the reasons below, the Court finds that Mr. Ambrosio must be disqualified as Roland's counsel.

## II.  Background[2]

### A.  Factual Overview

On March 21, 2014, a magistrate judge from this District informed Mr. Ambrosio that Mr. Ambrosio was going to represent CW in relation to an unidentified federal case.  (*See* D.E. 134-1 ("Ambrosio Decl.") ¶ 5; 1/14/16 Tr. at 3:6-12, 4:8-9).  At that time, CW was a criminal defendant in a New Jersey state case represented by a state public defender named Jessica Lyons, Esq.  (Ambrosio Decl. ¶¶ 6-7; 1/14/16 Tr. at 5:5-17).  Also on March 21, 2014, Assistant United States Attorney ("AUSA") Frazer—who is prosecuting the instant action against Roland— informed Mr. Ambrosio that his appointment to CW was for: CW to have an attorney with experience in federal court; Mr. Ambrosio to explain how federal cooperation worked to CW; Mr. Ambrosio to review the cooperation agreement with CW; and Mr. Ambrosio to advise CW regarding the potential impact CW's cooperation could have on CW's state sentence.  (Ambrosio Decl. ¶ 8; 1/14/16 Tr. at 5:18-7:5).  Mr. Frazer also informed Mr. Ambrosio that CW's cooperation concerned a gang case.  (Ambrosio Decl. ¶¶ 9-11; 1/14/16 Tr. at 7:5-11).

On March 24, 2014, another AUSA, Mr. Benvenuto, informed Mr. Ambrosio via telephone that CW was going to be called to testify before a Grand Jury related to a case that Mr. Benvenuto was prosecuting ("the Benvenuto matter").  (Ambrosio Decl. ¶ 12; 1/14/16 Tr. at 7:13-19).  The Benvenuto matter was unrelated to the prosecution of Roland.  (*See* D.E. No. 133 ("Gov't Mov. Br.") at 2 & n.5).

---

[2] Additional facts are provided where relevant in this Court's discussion, *infra*.

On March 25, 2014, a magistrate judge from this District officially appointed Mr. Ambrosio to represent CW under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. (Ambrosio Decl. ¶ 15; 1/14/16 Tr. at 7:20-8:20).  CW's federal status at this time was only as a cooperating witness; he had not been charged with a federal crime.  (Ambrosio Decl. ¶¶ 16-17; 1/14/16 Tr. at 8:21-9:2).  Also on this day, Mr. Benvenuto introduced Mr. Ambrosio to CW during which "no substantive conversations were had."  (Ambrosio Decl. ¶ 18; 1/14/16 Tr. at 9:3-10:4).

On March 26, 2014, Mr. Ambrosio met with CW for about an hour in private for the first and only time.  (Ambrosio Decl. ¶¶ 19, 21; 1/14/16 Tr. at 10:5-21).  At that time, CW was being held without bail in connection with the New Jersey state criminal case.  (Ambrosio Decl. ¶ 20; 1/14/16 Tr. at 10:25-11:5).  Also on this day, CW, Mr. Benvenuto, Mr. Ambrosio, and Ms. Lyons signed CW's cooperation agreement.  (1/14/16 Tr. at 11:10-13:3).[3]  Mr. Benvenuto signed the cooperation agreement below a signature block that listed Mr. Frazer's name.  (*Id.*).

According to the Government, the scope of the cooperation agreement contemplated CW's cooperation in two cases—the instant prosecution of Roland and the Benvenuto matter. (*See* Gov't Mov. Br. at 2; 1/14/16 Tr. at 13:16-14:21).  Mr. Ambrosio contends that he understood his role in representing CW to end once his March 26 meeting with CW was complete—and that Ms. Lyons remained CW's lead counsel.  (Ambrosio Decl. ¶ 25).

On or about April 1, 2014, CW testified before a Grand Jury in the District of New Jersey for the Benvenuto matter—i.e., not relating to the allegations in the instant Roland prosecution. (Gov't Mov. Br. at 2; 1/14/16 Tr. at 13:4-14:1).  On April 22, 2014, Mr. Ambrosio spoke with Ms. Lyons and Mr. Benvenuto to confirm that CW had testified before the Grand Jury.

---

[3] For the sake of completeness, the Court notes that Mr. John Gay, a supervisor at the U.S. Attorney's Office, signed the cooperation agreement and, furthermore, that AUSA Bruck's name is also in the signature block above which Mr. Benvenuto signed.  (1/14/16 Tr. at 12:16-13:3).

(Ambrosio Decl. ¶ 27; 1/14/16 Tr. at 14:22-15:9).  From Mr. Ambrosio's perspective, the purpose of this discussion was to ensure that his representation of CW was complete.  (Ambrosio Decl. ¶ 27).  Indeed, after the discussion, Mr. Ambrosio submitted his CJA voucher—which was marked as "FINAL."  (*Id.* ¶ 28; *see also* 1/14/16 Tr. at 15:10-25).

Fast-forwarding to September 2, 2015, this Court inquired as to whether Mr. Ambrosio was willing and available to represent Roland, pending a conflict-of-interest check.  (*See* Ambrosio Decl. ¶ 30; 1/14/16 Tr. 16:9-16).  In response, Mr. Ambrosio informed the Court—that same day—that he was willing and able to represent Mr. Roland assuming no conflicts of interest existed.  (Ambrosio Decl. ¶ 31; 1/14/16 Tr. 16:9-16).  Before September 2015, Mr. Ambrosio had never heard of Roland or the South Side Cartel, the alleged criminal gang under which Roland operated.  (Ambrosio Decl. ¶ 38; 1/14/16 Tr. 16:2-8, 31:14-18; D.E. No. 66 ¶¶ 1, 4-6, 11).[4]

On September 3, 2015, Mr. Jasper—Roland's learned counsel—introduced Mr. Ambrosio to Roland for an initial meeting that lasted approximately three hours.  (Ambrosio Decl. ¶¶ 33-34; 1/14/16 Tr. at 16:17-22).  On September 11, 2015, this Court formally appointed Mr. Ambrosio as Mr. Roland's counsel and relieved one of his former attorneys, Ms. Donna Newman.  (D.E. No. 110; 1/14/16 Tr. at 16:23-17:12).

The Government—including Mr. Frazer—did not object to Mr. Ambrosio's appointment during the September 11 hearing.  Indeed, the Government later agreed that, in September 2015, it failed to discover Mr. Ambrosio's representation of CW—but learned about it later while preparing for trial of this action.  (*See, e.g.*, Gov't Mov. Br. at 2 (explaining that the Government "neglected to learn" about a conflict of interest "at the time Mr. Ambrosio was appointed to represent Roland"); 1/14/16 Tr. at 25:2-4 ("We are here because of my mistakes because my

---

[4] A grand jury indicted Roland for, among other things, several racketeering acts under the Federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  (D.E. No. 66 ¶¶ 13-27).

memory failed me Mr. Ambrosio was in conflict."); 1/14/16 Tr. at 71:14-22 (addressing the "allegation that the government is manufacturing a conflict" and explaining that "Mr. Frazer has acknowledged that he neglected to note this, and everyone wishes that this were not the case, but we are in no way manufacturing a conflict here" because "[i]t was a mistake not to notice it when he was looking for conflict, and that is all that this is")).

As further discussed below, the Government now contends that Mr. Ambrosio has a conflict of interest because of his representation of Roland and his representation of CW—who will be testifying against Roland as a cooperating witness for the Government.  (Gov't Mov. Br. at 4).  The Government argues that this actual and potential conflict of interest necessitates disqualification of Mr. Ambrosio.  (*Id.* at 1).  But, as also detailed below, Roland vehemently contests the Government's motion.

### B.  Procedural Overview

The Court catalogs the various submissions, conferences, and hearings relating to the Government's motion to disqualify Mr. Ambrosio.   On December 11, 2015, Mr. Frazer informally advised this Court and Mr. Ambrosio that Mr. Frazer believed that Mr. Ambrosio has a conflict of interest.  (Gov't Mov. Br. at 2; D.E. No. 134 ("Def. Opp. Br.") at 7; 1/14/16 Tr. at 17:12-21).  On December 15, 2015, the Court held an informal conference during which, among other things, the parties presented their respective positions on the conflict issue and the Court set a briefing and hearing schedule.  (*See* D.E. No. 132; Def. Opp. Br. at 7-8).

On December 18, 2015, the Government filed its motion seeking to disqualify Mr. Ambrosio.  (Gov't Mov. Br.).   On December 28, 2015, Roland filed an opposition to the Government's motion.    (Def. Opp. Br.).    Mr. Ambrosio's declaration accompanied this submission.  (Ambrosio Decl.).  Having reviewed the submissions, on December 29, 2015, the Court ordered the Government to submit a reply to Roland's opposition, (D.E. No. 135), and the

Government submitted a reply in support of its motion on January 5, 2016, (D.E. No. 136 ("Gov't Reply Br.")).  On January 8, 2016, Roland then submitted a sur-reply in further support of his opposition.  (D.E. No. 137 ("Def. Sur-Reply Br.")).

On January 14, 2016, this Court held a hearing on the Government's motion—which was partly evidentiary in nature.  (*See, e.g.*, 1/14/16 Tr. at 2:25-17:24).  Notably, at this hearing, the Government provided the Court with an email (dated March 26, 2014) from Mr. Ambrosio to Mr. Benvenuto that: inquired as to whether further assistance was required by Mr. Ambrosio regarding CW; indicated that Mr. Ambrosio advised CW that he would be available to sit in any trial preparation meeting he may have with the U.S. Attorney's Office; and that—although CW seemed comfortable meeting with the U.S. Attorney's Office without Mr. Ambrosio—Mr. Ambrosio had informed CW that CW could ask for Mr. Ambrosio's assistance at any time, even in the middle of a trial preparation meeting.  (1/14/16 Tr. at 22:18-24:4, 27:13-16).  Further, because Roland's counsel cited case law at the January 14 hearing that the Government had not had an opportunity to address, the Court ordered supplemental briefing regarding that case law, (D.E. No. 141), and the parties thereafter provided such supplemental briefing, (D.E. No. 148 ("Gov't Supp. Br."); D.E. 152 ("Def. Supp. Br.")).

During the January 14 hearing, the Court determined that there is a potential conflict of interest and that the Court would be conducting hearings with both Roland and CW under Federal Rule of Criminal Procedure 44(c)(2)—which would require appointment of independent counsel for each individual.  (1/14/16 Tr. at 90:4-13, 93:22-25).

On January 14, 2016, the Court also held a hearing on the Rule 44(c) questions that would be proffered to Roland's independent conflict counsel in advance of the Rule 44(c) hearing.  (*Id.* at 94:1-3, 110:12-163:20).  Some of the disputes involving the questions required

the Court to seal the proceedings—whereby Roland was excused from the Courtroom, but his counsel remained and participated in oral argument—because they involved discussion of CW's identity and role in this case. (*See, e.g.*, *id.* at 80:11-14, 138:9-14). So, on January 14, the Court conducted a separate hearing under seal concerning these disputes. (*See* D.E. Nos. 142 & 145).

After receiving and researching recommended attorneys from Roland's counsel, the Court appointed Mr. Richard Levitt, Esq., to represent Roland as independent conflict counsel for the Rule 44(c) hearing. (*See* D.E. No. 149 (January 21, 2016, notice of appearance); D.E. No. 150 (stating that "[l]ast week the Court appointed [Mr. Levitt] . . . to represent Farad Roland as conflict counsel, to advise him regarding his decision whether or not to waive any potential or actual conflicts occasioned by the representation of a government cooperating witness by one of his current attorneys, Thomas Ambrosio")).

On February 2, 2016, the Court held a hearing for Roland in which all of Roland's counsel, including his independent conflict attorney, appeared. (*See* 2/2/16 Tr. at 2:12-15). The Court confirmed that Roland had an opportunity to confer with his conflict attorney, Mr. Levitt. (*Id.* at 2:16-3:1). The Court then asked Roland over 55 questions to probe—among other things—whether he understood the nature of the potential conflict of interest, had time to think about the conflict, understood the facts underlying the conflict, had time to discuss the matter with Mr. Levitt, whether he had questions for the Court, and whether he sought to waive the conflict. (*See generally id.* at 3:6-14:1).

For CW, the Court appointed an out-of-district attorney ("CW's conflict attorney") to represent CW for the Rule 44(c) hearing. After doing so, the Government sent CW's conflict attorney proposed Rule 44(c) questions and, on February 1, 2016, held a hearing on the proposed questions with CW's conflict attorney and the Government. (*See generally* 2/1/16 Tr. at 3:8-

13:24).   The Court confirmed that CW's conflict attorney had time to review the proposed questions and discuss the issues with CW, and that CW understood the issues involved.   (*See id.* at 12:14-13:2).

On February 3, 2016, the Court held a Rule 44(c) hearing for CW in which CW's conflict attorney appeared.   (2/3/16 Tr. at 2:17-19).   The Court engaged in a colloquy with CW involving over 60 questions to probe—among other things—whether CW understood the nature of the potential conflict of interest, had time to think about the conflict, understood the facts underlying the conflict, had time to discuss the matter with the independent conflict attorney, whether CW had questions for the Court, and whether CW sought to waive the conflict.   (*See generally id.* at 4:5-17:5).

## III.  The Parties' Arguments

### A.  The Government

As noted above, the Government asserts that Mr. Ambrosio must be disqualified because he has actual and potential conflicts of interest that prevent him from effectively representing Mr. Roland and CW.   (Gov't Mov. Br. at 1).   The Government's claim rests on Mr. Ambrosio's representation of Roland in the instant action and his representation of CW—who will testify against Roland as a cooperating witness for the Government.   (*Id.* at 4; *see also* Gov't Reply Br. at 2 ("Mr. Ambrosio represents [CW] in connection with his cooperation with the Government, and as a part of that cooperation, [CW] will testify against Roland, who Mr. Ambrosio also represents.")).[5]   The Government argues that there is an actual conflict of interest—or, at a minimum, a potential conflict of interest—because "Mr. Ambrosio has ethical obligations not to

---

[5] The Government concedes that the issue is not a *per se* conflict that would require automatic disqualification of Mr. Ambrosio.   (1/14/16 Tr. at 17:22-18:13).

reveal client confidences from his representation of [CW], but on the other hand, he owes a duty to Roland to represent him vigilantly and zealously."  (Gov't Mov. Br. at 6-7).

The Government also argues that—even if Mr. Ambrosio's representation of CW is terminated and CW is appointed new counsel—there is still a conflict of interest.  (*Id.* at 5). Citing New Jersey Rule of Professional Conduct 1.9(a) ("N.J. RPC"), the Government argues that this is the "same or a substantially related matter" because Mr. Ambrosio's "former client" (i.e., CW) will be testifying in a trial that will be adverse to Mr. Ambrosio's current client (i.e., Roland).  (*Id.*).  In any event, whether Mr. Ambrosio's representation of CW is ongoing or not, the Government contends that the same legal analysis applies.  (*Id.* at 1 n.1).

Indeed, the Government argues that "[n]othing cited by defense counsel changes the fact that—whether the Court determines that the CW is a former or current client of Mr. Ambrosio's—a waiver of conflict is required from CW in order for Mr. Ambrosio to remain in compliance with the New Jersey Rules of Professional Conduct."  (Gov't Supp. Br. at 1). Moreover, the Government argues that—even if the Court successfully makes a record that any such waivers are knowing and voluntary—the Court should exercise its discretion and reject any such waivers given the substantial institutional concerns and "hazards of allowing conflicted representation in this case."  (Gov't Mov. Br. at 8, 10).

Further, the Government argues that "Mr. Ambrosio was appointed, not retained, and the Supreme Court has repeatedly stated that 'the right to counsel of choice does not extend to defendants who require counsel to be appointed for them.'"  (Gov't Reply Br. at 3 (citation omitted)).  Indeed, the Government argues that—because no right to choice of counsel exists— the relevant balancing the Court must do involves a "prejudice analysis" and, here, "the potential conflict and the potential pitfalls" outweigh any prejudice to Roland.  (1/14/16 Tr. at 62:24-

63:16, 63:20-64:4, 70:22-71:4, 71:11-13; *see also* Gov't Supp. Br. at 4 ("The Government submits that here, the Court should weigh the serious potential conflicts against any prejudice to the Defendant—and given that trial is a year away and that Mr. Ambrosio has only been Defendant's counsel for three months, the conflicts far outweigh any prejudice to the Defendant.")).  But, even if Roland retained Mr. Ambrosio, the Government contends that the actual and potential conflicts-of-interest coming from his representation of a cooperating witness warrant disqualification.  (Gov't Reply Br. at 3).

Finally, in opposition to Roland's pre-motion request, the Government argues that pretrial disqualification here is not immediately appealable; it can only be raised on appeal from a judgment of conviction and sentence.  (Gov't Mov. Br. at 13).

### B. Roland

Roland argues that, here, at most a rebuttable actual conflict might exist if Mr. Ambrosio was privy to CW's expected testimony against Roland or if he advised CW on how to prepare for cross-examination—but that didn't happen here.  (Def. Opp. Br. at 12).  In fact, Roland posits that "Mr. Ambrosio has submitted a sworn declaration disputing the existence of any privileged communications that are relevant to the facts of this case."  (Def. Sur-Reply Br. at 1).  Roland also argues that CW's disclosure of attorney-client communications to the Government during a proffer session "destroys the attorney/client privilege *in toto*" such that "those communications are no longer privileged and no interest remains that requires protection."  (*Id.* at 2).  Further, Roland argues that Mr. Ambrosio has not represented CW since at least April 22, 2014—and this Court can easily issue an Order terminating any purported representation and appoint new counsel for CW.  (Def. Opp. Br. at 12).  Roland also avers that CW's state defender (Ms. Lyons) can represent CW.  (*Id.*).

Importantly, Roland challenges the Government's reliance on N.J. RPC 1.9, arguing that "the Government's motion to disqualify turns on the second prong of Rule 1.9, i.e., whether Mr. Ambrosio's representation of Mr. Roland involves a matter that is the same or 'substantially related' to his prior representation of CW." (Def. Supp. Br. at 2). And Roland asserts that the Government has not met its burden of proving that the second prong is satisfied. (*See id.* at 2-4).

To be sure, Roland maintains that there must be some proof that a potential conflict outweighs the right to counsel of his choice. (Def. Opp. Br. at 13). At oral argument, however, Roland seemed to argue that: (1) although he cannot afford to select Mr. Ambrosio, now Mr. Ambrosio has been appointed and has developed a certain special relationship; and (2) in such a scenario, an equitable balancing test—which mirrors the constitutional balancing test—must be applied. (*See* 1/14/16 Tr. at 64:13-67:13, 68:15-69:1). Indeed, Roland argues that the facts and circumstances of this case must be examined—and, when so examined, disqualification is not warranted. (*See* Def. Opp. Br. at 27-30).

And Roland argues that the Government's proposed scenarios in connection with why waivers should be rejected are speculative and unpersuasive. (*See id.* at 15). Indeed, Roland argues that "speculation, which is embodied in the 'doctrine' of 'appearance of impropriety,' 'is not a factor to be considered in determining whether a prohibited conflict of interest exists under [New Jersey's] RPC 1.7, 1.8, or 1.9 as its use injects an unneeded element of confusion.'" (*Id.* at 27 (citation omitted)).

In short, Roland asserts that Mr. Ambrosio's loyalties are undivided, his representation of CW was limited, and this representation did not result in Mr. Ambrosio learning any confidences related to CW's credibility or the Government's prosecution of this case. (*Id.* at 25). He maintains that "nothing Mr. Ambrosio learned during his prior representation of CW could

jeopardize CW's cooperation, have the potential of revealing attorney/client communications, or divide his loyalties in some unexpected fashion." (*Id.*).

Finally, Roland argues that "more recent case law calls the continued viability" of the Supreme Court's *Flanagan* decision—which held that a defendant has no automatic right to an interlocutory appeal of a counsel-disqualification decision—into doubt. (*Id.* at 33-34 (citing *Flanagan v. United States*, 465 U.S. 259 (1984))). Roland argues that "this is a death penalty case, and as such different rules and considerations apply" whereby "there is the possibility that [his] life literally hangs in the balance since an erroneous disqualification of Mr. Ambrosio could result in Mr. Roland's *execution*." (*Id.* at 34-35). Roland contends that "there is no Federal statute that specifically prohibits this Court from certifying an appeal in a criminal case" and, moreover, "when no analogous criminal rule exists to address the issue one way or the other, the analogous civil rule applies"—i.e., 28 U.S.C. § 1292(b). (*Id.* at 35).

## IV.  Applicable Legal Principles

### A.  A Defendant's Sixth Amendment Rights

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend VI. "[T]his right was designed to assure fairness in the adversary criminal process." *Wheat v. United States*, 486 U.S. 153, 158 (1988) (citing *United States v. Morrison*, 449 U.S. 361, 364 (1981)).

In particular, the "Sixth Amendment guarantee of effective assistance of counsel includes two correlative rights, the right to adequate representation by an attorney of reasonable competence and *the right to the attorney's undivided loyalty free of conflict of interest*." *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir. 1988) (emphasis added) (citation omitted). "The attorney's undivided loyalty is required because the type of effective 'assistance of counsel'

- 12 -

the Sixth Amendment guarantees a criminal defendant is that which puts the government to its proofs in an adversarial manner, and for this counsel free of conflicts of interest is necessary." *United States v. Moscony*, 927 F.2d 742, 748 (3d Cir.) (citation omitted), *cert. denied*, 501 U.S. 1211 (1991). Put simply, a criminal defendant has a "right to conflict-free representation." *Id.*; *see also United States v. Lacerda*, 929 F. Supp. 2d 349, 356 (D.N.J. 2013) ("It is beyond dispute that the Sixth Amendment guarantee of effective assistance of counsel encompasses the right to counsel's undivided loyalty." (citation omitted)).

To be sure, "another right is derived from the right to effective assistance of counsel": "a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Moscony*, 927 F.2d at 748 (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)); *see also United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir. 1996) ("One element of this basic guarantee [of the Sixth Amendment] is the right to counsel of choice." (citation omitted)). After all, a

> primary purpose of the Sixth Amendment is to grant a criminal defendant control over the conduct of his defense—as "it is he who suffers the consequences if the defense fails,"—and "[a]n obviously critical aspect of making a defense is choosing a person to serve as an assistant and representative."

*Moscony*, 927 F.2d at 748 (citations omitted) (first quoting *Faretta v. California*, 422 U.S. 806, 820 (1975)) (second quoting *Wheat*, 486 U.S. at 166 (Marshall, J., dissenting)). Thus, "a presumptive right to the counsel of one's choice has been recognized as arising out of the Sixth Amendment"—and, unless this presumption is overcome, a criminal defendant has the right to choose his or her counsel. *Id.* (citing *Wheat*, 486 U.S. at 159 (majority opinion)).

But "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (citations omitted). Moreover, "not only when an actual conflict is found, but when there is a showing of a

serious potential for conflict, the presumption in favor of a defendant's counsel of choice is overcome and *the trial court may disqualify counsel and reject the defendant's waiver of conflict-free representation*." *Moscony*, 927 F.2d at 750 (emphasis added) (citations and quotation marks omitted).

### B.  Procedural Considerations if a Conflict-of-Interest Issue Arises

Courts appear to use a certain framework to analyze when a conflict-of-interest issue arises.  First, a court must determine whether a conflict of interest exists, whether actual or potential.  *See, e.g.*, *Moscony*, 927 F.2d at 748-50.  Second, if a conflict of interest exists, the court must then determine whether that conflict of interest outweighs the presumption in favor of the defendant's choice of counsel.  *See id.*  If a court determines that the conflict outweighs the presumption, the court may disqualify counsel and reject the defendant's waiver of conflict-free representation.  *See id.*; *see also United States v. Lebed*, No. 05-362, 2005 WL 1971877, at *3 (E.D. Pa. Aug. 12, 2005) ("A trial court has discretion to order attorney disqualification upon a finding of actual conflict or serious potential conflict, notwithstanding any waiver of conflict by the defendant.").

Importantly, however, "a trial court may not arbitrarily deny a defendant's right to counsel of choice."  *Voigt*, 89 F.3d at 1075.  "Normally, the trial court should conduct an evidentiary hearing or factual inquiry to determine whether disqualification is appropriate and should inquire into the nature of the conflict and the client's awareness of the conflict."  *Gov't of V.I. v. Zepp*, 748 F.2d 125, 139 (3d Cir. 1984).  "The court should also determine whether there has been a waiver of the conflict, whether the waiver was effective or whether a waiver was possible."  *Id*.

In particular, Federal Rule of Criminal Procedure 44 provides, in relevant part, that a

court "must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation."   Fed. R. Crim. P. 44(c)(2).   "Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel."  *Id.*[6]  Courts have applied Rule 44(c) for conflict-of-interest issues involving former clients.  *See, e.g.*, *United States v. Reeves*, No. 11-520, 2011 WL 6028000, at *1-2 (D.N.J. Dec. 2, 2011); *United States v. Stansfield*, 874 F. Supp. 640, 642 (M.D. Pa. 1994). Finally, the moving party bears the burden of showing that disqualification is necessary.  *City of Atl. City v. Trupos*, 992 A.2d 762, 771 (N.J. 2010) ("[T]he burden of persuasion on all elements under *RPC* 1.9(a) remains with the moving party, as it bears the burden of proving that disqualification is justified." (citation and quotation marks omitted)).

## C.  The Fact-Specific Inquiry of a Conflict-of-Interest Issue

The "tension between protecting the institutional legitimacy of judicial proceedings, which includes a concern to shield a defendant from having his defense compromised by an attorney with divided loyalties, and allowing a defendant to be represented by the attorney of his choice, creates the disqualification issue."  *United States v. Stewart*, 185 F.3d 112, 122 (3d Cir. 1999).

"The evaluation of the facts and circumstances of each case . . . must be left primarily to the informed judgment of the trial court."  *Wheat*, 486 U.S. at 164; *see also Lebed*, 2005 WL 1971877, at *3 ("Several Third Circuit cases have addressed the issue of when an attorney's so-

---

[6] *See also United States v. Perez*, 325 F.3d 115, 119 (2d Cir. 2003) (explaining that the trial court conducts a hearing whereby it "(1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by his present counsel and freely chooses to run them." (citing *United States v. Curcio*, 680 F.2d 881, 888-90 (2d Cir. 1982))).

called 'divided loyalties' between a current client who is a defendant in a criminal trial and a former client serving as a prosecution witness create a conflict of interest. *A review of such cases indicates that district courts' decisions on disqualification are highly fact-driven*." (emphasis added)).

Two types of conflict of interest exist: actual and potential. *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980); *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004). "An actual conflict of interest exists when the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action, *or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client*." *Jones*, 381 F.3d at 119 (emphasis added) (citations and quotation marks omitted). "An attorney has a potential conflict of interest if the interests of the defendant *could* place the attorney under inconsistent duties in the future." *Jones*, 381 F.3d at 119 (citing *United States v. Kliti*, 156 F.3d 150, 153 n.3 (2d Cir. 1998)). But "[d]etermining whether such a potential conflict exists is no simple task" because "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials." *Voigt*, 89 F.3d at 1076 (quoting *Wheat*, 486 U.S. at 162-63).

And the "Third Circuit has recognized that a 'Defendant's choice of counsel is not to be dealt with lightly or arbitrarily.'" *Reeves*, 2011 WL 6028000, at *8 (quoting *United States v. Flanagan*, 679 F.2d 1072, 1076 (3d Cir. 1982)). Notably, "[t]hat choice should not be interfered with in cases where potential conflicts of interest are *highly speculative*." *Id.* (emphasis added) (quoting *Flanagan*, 679 F.2d at 1076).

### D. Waivers of Conflict-Free Representation

Accordingly, "[u]pon finding that an attorney's representation of his client is limited by a

conflict of interest, 'the Court is obligated to examine whether a waiver is feasible under the circumstances and the validity and effectiveness of any waivers submitted to cure the identified conflicts of interest.'" *Lacerda*, 929 F. Supp. 2d. at 362 (quoting *United States v. Kolodesh*, No. 11-464, 2012 WL 1156334, at *8 (E.D. Pa. Apr. 5, 2012)).

"While a defendant may waive his right to conflict-free counsel, a court has discretion to refuse such a waiver if the court concludes that there exists either an actual conflict of interest or a serious potential for a conflict of interest." *United States v. Hawkins*, No. 04-370-05, 2004 WL 2102017, at *4 (E.D. Pa. Aug. 26, 2004) (citing *Moscony*, 927 F.2d at 750).   Simply put, "a waiver . . . does not necessarily resolve the matter." *Moscony*, 927 F.2d at 749.

So, "a district court has discretion to disqualify counsel if a potential conflict exists even where the represented parties have waived the conflict." *Stewart*, 185 F.3d at 122 (citation omitted).   In fact, the Supreme Court has held that a district court "must be allowed *substantial latitude in refusing waivers of conflicts* of interest not only in those rare cases where an actual conflict may be demonstrated before trial, *but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses*." *Wheat*, 486 U.S. at 163 (emphases added).

## V.  Discussion

### A.  The Court Must Disqualify Mr. Ambrosio, Esq.

The Court must first determine whether a conflict of interest exists, whether actual or potential. *See Moscony*, 927 F.2d at 748-50.   "'[C]onflict of interests' is a term that is often used and seldom defined"—but the "prevailing norms of practice provide some guidance." *Zepp*, 748 F.2d at 135 (quoting *Cuyler*, 446 U.S. at 356 n.3 (Marshall, J., concurring in part and dissenting in part)) (discussing the Virgin Islands Bar Association's use of the ABA's Model Code of

Professional Responsibility).

Applicable here is N.J. RPC 1.9(a), which provides that "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the *same or a substantially related matter* in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing." (emphasis added); *see also* ABA Model Rules of Prof. Conduct 1.9(a).[7]

Here, the "same or a substantially related matter" element is at issue.  (*See, e.g.*, Def. Supp. Br. at 2).  Notably, in *Trupos*, the New Jersey Supreme Court held that, for RPC 1.9,

> matters are deemed to be "substantially related" if (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client, *or* (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.

992 A.2d at 764 (emphasis added).  The *Trupos* standard requires "a fact-sensitive analysis to ensure that the congruity of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client."  *Id.* at 774.

Moreover, *Trupos* requires that the party seeking disqualification bears the initial burden of production of showing that "that the lawyer(s) for whom disqualification is sought formerly represented their present adverse party and that the present litigation is materially adverse to the former client."  *Id.* at 771.  If that burden is met, the burden of production shifts to the attorney(s) for whom disqualification is sought to show that "the matter or matters in which he or they represented the former client are not the same or substantially related to the controversy in which the disqualification motion is brought."  *Id.*

---

[7] *But see State v. Hudson*, No. A-2943-14T4, 2015 WL 9263744, at *7 (N.J. Super. Ct. App. Div. Dec. 21, 2015) (discussing that "appearance of impropriety" "is not a factor to be considered in determining whether a prohibited conflict of interest exists under *RPC* 1.7, 1.8 or 1.9 as its use injects an unneeded element of confusion" (citation and quotation marks omitted)).

Significantly, the parties agree that the *Trupos* standard applies to the instant dispute. (*See* Gov't Supp. Br. at 2-3; Def. Supp. Br. at 2-4).  The Government argues that Mr. Ambrosio's representation of Roland is in the same matter as Mr. Ambrosio's representation of CW—or at least is a substantially related matter.  (*See* Gov't Supp. Br. at 2-3).  But Roland argues that Mr. Ambrosio's representation of Roland does not involve a matter that is the same or substantially related to his representation of CW.  (*See* Def. Supp. Br. at 2-4).

The Court finds that, at a minimum, Mr. Ambrosio's representation of Roland involves a "substantially related matter" to his representation of CW under N.J. RPC 1.9(a) because the Court finds that the second prong of the *Trupos* test is met—i.e., the facts relevant to Mr. Ambrosio's representation of CW are both relevant and material to his representation of Roland.

Mr. Ambrosio represented CW in connection with CW entering into a federal cooperation agreement.  (Ambrosio Decl. ¶ 8; 1/14/16 Tr. at 5:18-7:6).[8]  Mr. Ambrosio told Mr. Benvenuto that he advised CW that he "would be available to sit in any trial preparation meeting [CW] may have with [the] office" and informed CW that CW "can ask for [Mr. Ambrosio's] assistance at any time, even in the middle of a trial prep meeting."  (Gov't Supp. Br. at 1 (quoting March 26, 2014 email from Mr. Ambrosio to Mr. Benvenuto)).  Mr. Ambrosio also told Mr. Benvenuto that he had "time to assess any potential self incrimination issues that [CW] might face during his continued cooperation."  (*Id.* at 2 (quoting March 26, 2014 email from Mr. Ambrosio to Mr. Benvenuto)).  Mr. Ambrosio later signed CW's federal cooperation agreement. (1/14/16 Tr. at 11:10-13:3).  CW will testify—adverse to Roland—pursuant to this very federal cooperation agreement.  (Gov't Mov. Br. at 4-5; Gov't Reply Br. at 2; 1/14/16 Tr. at 18:19-25).

---

[8] For purposes of this discussion, the Court will accept that CW is at least a former client and, therefore, uses the past tense in connection with Mr. Ambrosio's representation of CW.  Indeed, consistent with the Court's determination at the January 14, 2016 hearing, (*see* 1/14/16 Tr. at 43:2-44:10, 95:18-96:8), the Court hereby formally relieves Mr. Ambrosio as CW's attorney and appoints Rocco Cipparone, Jr., Esq., to represent CW.

Tellingly, Roland does not seem to directly address the second prong of the *Trupos* test without also referencing confidential information.  For example, in his supplemental brief, Roland asserts that "surmise alone cannot support an order of disqualification" and argues that Mr. Ambrosio did not receive confidential information from CW that can be used against CW in Mr. Ambrosio's representation of Roland.  (Def. Supp. Br. at 2-3 (quoting *Trupos*, 992 A.2d at 775); *see also id.* at 4 ("CW never provided Mr. Ambrosio with any confidential information that is *material and relevant to Mr. Roland's defense*.")).

But these contentions concern the first prong of the *Trupos* test, not the second prong.  *See* 992 A.2d at 775-776 ("[C]onclud[ing] that (1) during its representation of plaintiff in 2006-2007, the law firm did not receive confidential information from plaintiff which can be used against plaintiff in the prosecution of the 2009 tax appeals adverse to plaintiff, and (2) the facts relevant to the law firm's 2006 representation of plaintiff also are not relevant and material to the law firm's representation of the taxpayers in the 2009 tax appeals.").[9]

To be sure, Roland argues that "the mere fact that the subject matter is the same is not enough to deem a case substantially related."  (Def. Supp. Br. at 2-3 (internal quotation marks omitted) (quoting *Chi Ming Yau v. He Cheng Rest. Corp.*, No. 12-6754, 2015 WL 3540596, at *7 (D.N.J. June 2, 2015))).  But there is more than just simply "the same subject matter" here.  After all, CW is a key witness for the Government's prosecution of Roland.  CW will testify for the

---

[9] And his argument that, in Mr. Ambrosio's view, the cooperation agreement was only for the Benvenuto matter misses the mark factually.  (*See* 1/14/16 Tr. at 51:5-52:1).

The Court is also not convinced otherwise by Roland's reliance on *United States v. Morrell-Corrada*, 343 F. Supp. 2d 80 (D.P.R. 2004).  (Def. Supp. Br. at 5-6 ("[W]e cannot over-state the similarities between [the *Morrell-Corrada* case] and the case at bar. . . .  [T]he court's analysis was entirely dependent upon Rule 1.9 of the Model Rules of Professional Conduct, which is identical to NJ RPC 1.9. . . . [W]e know of no case that is more closely parallel to the instant disqualification motion.")).  But, as the Government correctly notes, (Gov't Supp. Br. at 3 n.1), the *Morrell-Corrada* case turned on whether the interests of the former and current client were "materially adverse"—something which is undisputed here.  *See Morrell-Corrada*, 343 F. Supp. 2d at 84 ("In the case at bar, 'material adversity' is the determinative element in a finding of no conflict.").  In no uncertain language, the court in that case ruled that, "[g]iven that the contours of [the former witness's] anticipated testimony do not encompass defendant, it cannot be concluded that his testimony will be directly adverse to defendant."  *Id.* at 85.

Government based on his understanding of the cooperation agreement—which was reached with Mr. Ambrosio's counsel.  In other words, Mr. Ambrosio advised CW in connection with the cooperation agreement—and that cooperation agreement governs CW's testimony against Roland in this action.  Any benefit to CW for cooperation is, of course, relevant to CW's credibility, which Roland will challenge.  Mr. Ambrosio's representation of Roland consequently involves (at a minimum) a substantially related matter to his representation of CW.

Given these facts, the Court finds that the Government has met its burden of production that Mr. Ambrosio faces a serious potential conflict of interest and that Roland failed to meet his burden of production to show that CW's matter is not substantially related to the instant prosecution of Roland.  *See Trupos*, 992 A.2d at 771 (discussing the parties' respective burdens of production, but clarifying that "the burden of persuasion on all elements under *RPC* 1.9(a) remains with the moving party").

Again, it is indisputable that—at the very least—CW is Mr. Ambrosio's former client and Roland is his current client.  (*E.g.*, 1/14/16 Tr. at 45:1-10).  CW is a key witness in the Government's prosecution of Roland.  (*Id.* at 80:11-14).  As a cooperating witness, CW will be testifying at Roland's trial.  (Gov't Mov. Br. at 4-5; 1/14/16 Tr. at 18:19-25; *see also* Gov't Reply Br. at 2 ("Mr. Ambrosio represents [CW] in connection with his cooperation with the Government, and as a part of that cooperation, [CW] will testify against Roland, who Mr. Ambrosio also represents.")).  And Roland does not dispute that his interests are materially adverse to CW's interests.  (*See, e.g.*, Def. Supp. Br. at 2).

Thus, the Court finds that N.J. RPC 1.9(a) applies.  Accordingly, CW's informed consent is required before Mr. Ambrosio can continue representing Roland in this action.  But CW has

refused to provide such consent or a waiver.  Particularly telling is CW's own explanation of the issue and subsequent refusal to provide written consent:

> [Court]. So that this Court may be sure that you fully understand these issues, in your own words, please describe what you believe is at issue today . . . .
>
> [CW]. I think Mr. Ambrosio is unloyal because, one, he came down and sat down with me and had a conversation, and two, knowing that, he should not have a conversation with me, he should not have sat down with Mr. Roland. So I feel as though that he shouldn't represent me or Mr. Roland.
>
> [Court]. Okay. So you feel that he shouldn't have represented you or Mr. Roland at this time. Is that your position?
>
> [CW]. Yes.
>
> [Court]. With regard to Mr. Ambrosio's current representation of Mr. Roland, am I to understand that you are not waiving your Sixth Amendment right relating to representation by counsel with potential or actual conflict of interest.
>
> [CW]. Yes. Yes.
>
> [Court]. You are not, correct?
>
> [CW]. I am not. I am not.

(2/3/16 Tr. at 16:1-22).  Based on the colloquy with the Court, as well as the representations of his independent conflict counsel, the Court finds that CW made a knowing and intelligent decision.  Further, the Court is convinced that CW's decision was voluntarily made.  (*See id.* at 16:23-17:5).

### B. Any Prejudice to Roland is Insufficient to Mandate a Different Outcome

If a conflict of interest exists, the Court must next determine whether the conflict of interest outweighs the presumption in favor of the defendant's choice of counsel.  *See Moscony*, 927 F.2d at 748-50.  If the Court determines that the conflict outweighs the presumption, the

- 22 -

Court may disqualify counsel and reject the defendant's waiver of conflict-free representation. *See id.*

But, as discussed above, this Court appointed Mr. Ambrosio to represent Roland; Roland did not retain him. "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151. "The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989); *see also Wheat*, 486 U.S. at 159 ("[A] defendant may not insist on representation by an attorney he cannot afford . . . .").

Both parties seem to agree, however, that the Court should weigh the conflict of interest at least against any prejudice to Roland. (*See* Gov't Supp. Br. at 4 ("The Government submits that here, the Court should weigh the serious potential conflicts against any prejudice to the Defendant . . . ."); Def. Sur-Reply Br. at 4 ("Obviously, an indigent defendant cannot force a judge to appoint a specific attorney to represent him relying solely upon this aspect of the Sixth Amendment. However, if, as here, the attorney has *already been appointed*, and thus already developed an attorney/client relationship without prior objection from the Government, then the fact that he was not retained becomes irrelevant absent an actual conflict . . . ."); Def. Supp. Br. at 5 (noting "the strong bond that Mr. Ambrosio has developed with Mr. Roland and the entire defense team over the now nearly-five-months since his appointment in this case" (emphasis in original))).

Indeed, Roland's counsel referred to this as an "equitable balancing," a phrase that seems to appropriately capture the balancing required. (1/14/16 Tr. at 68:23-69:1 ("I think there are

two balances, one is the constitutional balancing, and one is the equitable balancing, which your Honor referred to before. I don't think anyone disputes that.")); *see also United States v. Basham*, 561 F.3d 302, 325 (4th Cir. 2009) ("Basham, as an indigent defendant, had the right to effective assistance of counsel, but not to counsel of his own choosing. He thus must point to some type of prejudice suffered because of the removal of [his counsel] . . . .").[10]

To that extent, the Court finds that equity here does not override N.J. RPC 1.9(a)'s requirement that CW—as Mr. Ambrosio's former client—give informed consent before Mr. Ambrosio can represent Roland.  Although jury selection is currently scheduled to begin in September of this year, (D.E. No. 111), the Court will hold a status conference and modify the pre-trial and trial schedule to permit Mr. Ambrosio's replacement reasonable time (i.e., at least three months) to become integrated with Roland's other counsel and prepare for trial.[11]  And trial will begin over a year from now.

Notably, the Court is appointing Mr. Stephen Turano, Esq., who is a very experienced member of the New Jersey Bar.  Before selecting Mr. Turano, the Court—with the assistance of both Roland's counsel and the Government—devoted substantial time to carefully vet replacement attorneys for Mr. Ambrosio should the Government's motion be granted.  In particular, the Court endeavored to select an attorney who, not only has the requisite experience, but has the availability and resources for this complex, death-penalty action against Roland. Indeed, Roland's learned counsel—while firmly maintaining its opposition to the Government's motion to disqualify and reserving all rights to appeal any disqualification decision—informally

---

[10] At the January 14, 2016 hearing, Roland's counsel directed the Court and the Government to several cases for the first time purportedly to show that the appointment of an attorney and the subsequent development of an attorney-client relationship implicates the Sixth Amendment's right to counsel.  (*See* D.E. No. 141 (compiling cases)).  The Court agrees with the Government, however, that the Supreme Court has not held so.  *See, e.g., Gonzalez-Lopez*, 548 U.S. at 151; *Wheat*, 486 U.S. at 159.

[11] To be sure, the three-month timeframe mirrors the period from early September 2015 (when Mr. Ambrosio was appointed to represent Roland) to early December 2015 (when the Government discovered the conflict issue).

indicated to the Court that Mr. Turano would be an appropriate replacement should the Court disqualify Mr. Ambrosio.  Having carefully vetted Mr. Turano, and having consulted with both Roland's counsel and the Government for conflicts purposes among other things, the Court has no doubt that Mr. Turano will be an effective advocate for Roland.

Nevertheless, the Court does not arrive at its decision to disqualify Mr. Ambrosio lightly. This is a death penalty case in which Mr. Ambrosio was able to "build an immediate, trusting, attorney/client relationship."   (Ambrosio Decl. ¶ 35).   The Court is mindful that it is Mr. Ambrosio's "wish to continue to represent Mr. Roland in this case," that Mr. Ambrosio was "unwilling to voluntarily withdraw as counsel for Mr. Roland," and that "Mr. Jasper, Mr. Bachrach, and Mr. Roland have each told [Mr. Ambrosio] that they do not want [him] to withdraw," and that each of these individuals "wishes [Mr. Ambrosio's] representation of Mr. Roland to continue." (*Id.* ¶¶ 40-41).  Particularly telling is Roland's own explanation of the issue and subsequent waiver:

> [Court]. So that this Court may be sure that you fully understand these issues, in your own words, Mr. Roland, please describe what you believe is at issue today.
>
> [Roland]. I fully understand that Mr. Ambrosio represented the witness in the past. Now he is representing me. And I can't, and Mr. Ambrosio can't, there is -- he can't use anything that he learned from the witness against him, or if it benefit me, and I am here today to waive the conflict with Mr. Ambrosio, I am here to waive the conflict relating to his prior representation of the witness.
>
> [Court]. With regard to Mr. Ambrosio's prior representation of the witness, do you voluntarily waive your Sixth Amendment rights relating to the representation by counsel with potential or actual conflicts of interest, Mr. Roland?
>
> [Roland]. Yes.

(2/2/16 Tr. at 12:7-24).   Indeed, based on the colloquy with the Court, as well as the representations of his independent conflict counsel, the Court finds that Roland made a knowing and intelligent waiver.  Further, the Court is convinced that Roland's decision was voluntarily made.  (*See id.* at 12:25-13:25).

In addition, the Court is aware that "motions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary."  *Carlyle Towers Condo. Ass'n v. Crossland Sav.*, 944 F. Supp. 341, 345 (D.N.J. 1996) (internal quotation marks and textual modifications omitted); *see also Southward v. Elizabeth Bd. of Educ.*, No. 15-3699, 2015 WL 8780536, at *2 (D.N.J. Dec. 14, 2015) ("Under New Jersey law, disqualification of counsel is a harsh discretionary remedy which must be used sparingly." (citation, quotation marks, and textual modifications omitted)).

But, as discussed, the law compels the Court's decision; it makes it absolutely necessary.  After all, this Court "has independent interests in protecting its judgments against later collateral attack, preserving the integrity of its proceedings, and protecting the truth-seeking function of the proceedings."  *See Voigt*, 89 F.3d at 1076 n.12.  And, given the seriousness and complexity of this RICO prosecution against Roland, this Court is especially mindful of the Third Circuit's directive to: "enforce the ethical rules governing the legal profession with respect both to client-attorney communications and to conflict-free representation, . . . regardless of any purported waiver"; "protect[] the truth-seeking function of the proceedings over which it is presiding by considering whether the defendant has effective assistance of counsel, regardless of any proffered waiver"; "protect the critically important candor that must exist between client and attorney"; and "protect[] a fairly-rendered verdict from trial tactics that may be designed to

generate issues on appeal." *See Moscony*, 927 F.2d at 749.[12]

The Court has conducted a fact-sensitive analysis and has determined that Mr. Ambrosio cannot act adverse to CW—who is indisputably Mr. Ambrosio's former client, who will testify against Roland pursuant to a cooperation agreement reached with the counsel of Mr. Ambrosio, and who refused to give written consent for Mr. Ambrosio to continue to represent Mr. Roland in this action. *See Wheat*, 486 U.S. at 164 ("The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court."); *Trupos*, 992 A.2d at 774 (requiring "a fact-sensitive analysis to ensure that the congruity of facts, and not merely similar legal theories, governs whether an attorney ethically may act adverse to a former client" for purposes of N.J. RPC 1.9).

### C. This Court Cannot Certify its Accompanying Order for an Interlocutory Appeal

Roland "submit[s] that irrespective of the outcome of the Government's motion, this Court should certify an appeal in light of the nature of this case, the potential consequences either side will face based upon this Court's decision, and in the interests of justice to ensure that an authorized death penalty trial, estimated by the Government to last up to seven months, does not proceed in vain." (Def. Opp. Br. at 37; *see also id.* at 36 ("[T]he Government points to no case, and defense counsel knows of none, that prohibits this Court from certifying an appeal if this Court determines that it is in the interests of justice to do so. As such, irrespective of whether the parties possess an automatic right to appeal the present motion, we respectfully submit this Court can bestow that right through the exercise of its discretion.")).

---

[12] *See also Hawkins*, 2004 WL 2102017, at *4 (explaining that *Moscony* "identified factors that a court should consider when determining whether to accept such a waiver"—and the factors involve "protecting the truth-seeking function," "right to effective assistance of counsel," "protection of attorney-client communications" and related "candor," "respect for the court" through "enforcement of ethical rules," and protecting "a fairly rendered verdict" from tactics implemented for the sake of appeal).

But the Government contends that "the Supreme Court has held that the pretrial disqualification of defense counsel in a criminal prosecution is not immediately appealable and therefore can only be raised on appeal from a judgment of conviction and sentence."  (Gov't Mov. Br. at 13 (citing *Flanagan v. United States*, 465 U.S. at 267)); *see also* Gov't Reply Br. at 5 n.2 ("On the issue of an interlocutory appeal, *Flanagan v. United States*, 465 U.S. 259 (1984), governs and is dispositive. Nothing cited in Defendant's Response says otherwise, and short of the Supreme Court overruling *Flanagan*, it remains the rule.")).

The Court construes Roland's arguments as a request to certify the accompanying Order for appeal.  (*See* Def. Sur-Reply Br. at 5 ("[A]n interlocutory appeal is appropriate in this authorized death penalty case in the event that the Government's motion is granted.")).  But this Court simply cannot do so.  *See Flanagan v. United States*, 465 U.S. at 260 ("We decide today that a District Court's pretrial disqualification of defense counsel in a criminal prosecution is not immediately appealable under 28 U.S.C. § 1291.").[13]

## VI.  Conclusion

For the reasons above, the Court must grant the Government's motion and disqualify Mr. Ambrosio, Esq.  An appropriate Order accompanies this Opinion.

*s/ Esther Salas*
**Esther Salas, U.S.D.J.**

---

[13] *See also id.* at 266 ("An order disqualifying counsel lacks the critical characteristics that make orders denying bail reduction or refusing to dismiss on double jeopardy or Speech or Debate grounds immediately appealable. Unlike a request for bail reduction, a constitutional objection to counsel's disqualification is in no danger of becoming moot upon conviction and sentence.").